UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                   )
DANIEL LaPLANTE,                   )
                                   )
                 Plaintiff,        )
                                   )      CIVIL ACTION
          v.                       )      NO. 13-10606-WGY
                                   )
MASSACHUSETTS DEPARTMENT OF        )
CORRECTION and SEAN MEDEIROS,[1]   )
                                   )
                 Defendants.       )
_____)

YOUNG, D.J.                                    March 6, 2015

MEMORANDUM AND ORDER

I.    INTRODUCTION

     Daniel LaPlante ("LaPlante"), a prisoner at the

Massachusetts Correctional Institution - Norfolk ("MCI-

Norfolk"), brings this action against the Massachusetts

Department of Correction (the "DOC") and its superintendent

(collectively, the "Defendants") under the Religious Land Use

and Institutionalized Persons Act ("RLUIPA") seeking declaratory

and injunctive relief from what he claims are unlawful burdens

on the practice of his Wicca faith.  The case is now before the

Court on cross-motions for summary judgment.

_____

     [1] On February 28, 2014, original defendant Gary Roden was
replaced as acting superintendent of MCI-Norfolk by Sean
Medeiros, who automatically replaced Roden as a defendant in
this litigation pursuant to Federal Rule of Civil Procedure
25(d).  Mem. Law Supp. Defs.' Cross-Mot. Summ. J. 2 n.1, ECF No.
25.

## A. Procedural History

LaPlante filed this action against the DOC and MCI-Norfolk Superintendent Gary Roden ("Roden") on March 14, 2013. Compl., ECF No. 1. Roden answered on May 7, 2013, Answer Def. Roden Compl., ECF No. 8, and the DOC did the same on May 21, Answer Def. Mass. Dep't Corr. Compl., ECF No. 14. LaPlante first moved for summary judgment on April 10, 2014, Pl.'s Mot. Summ. J., ECF No. 20, and the DOC filed its own cross-motion for summary judgment and an accompanying memorandum roughly two weeks later on April 29, Defs.' Cross-Mot. Summ. J., ECF No. 24; Mem. Law Supp. Defs.' Cross-Mot. Summ. J. ("Defs.' Mem."), ECF No. 25. On May 2, 2014, this Court summarily denied LaPlante's motion as insufficient to carry his burden at the summary judgment stage. Elec. Order, ECF No. 26. Subsequently, on May 15, LaPlante filed another motion for summary judgment, which incorporated his arguments in support of this second motion and in opposition to the DOC's cross-motion. Pl.'s Second Mot. Summ. J., & Resp. Defs.' Cross-Mot. Summ. J. ("Pl.'s Mem."), ECF No. 28.

## B. Factual Background

LaPlante is a sincere adherent of the Wicca faith and is listed as such in the DOC's "Inmate Management System." Compl. ¶¶ 7-8. In his complaint, he alleges a number of ways in which the Defendants are burdening the exercise of his faith; for clarity of presentation, the facts associated with each of those

alleged burdens will be discussed below alongside the legal analysis of LaPlante's claims. Conversely, the facts that appear directly below speak to LaPlante's Wicca faith and the DOC's practices regarding that faith in a more general sense.

Wicca, a neo-pagan religion focused on nature and magic, has been practiced by inmates at MCI-Norfolk since at least 1985. Id. ¶¶ 9-10. To facilitate the practice of Wicca, the DOC claims to provide inmates with access to Tarot cards, an altar cloth, an altar bowl, a magic circle, raven feathers, a brass bell, worry stones, meditation tapes, a chalice, candles, a candleholder, a candlesnuffer, incense, cardboard cutouts, a wand, runes, a cloth bag, several kinds of pendants, prayer oil, a book of shadows, and other reading and listening material. Defs.' Mem., Ex. 2, Aff. Cynthia Sumner ("Sumner Aff.") ¶ 13, ECF No. 25-2. Wiccans at MCI-Norfolk are allowed to use the Community Services Division ("CSD") building for worship; the building also hosts a large number of scheduled activities (religious and otherwise) for up to 250 inmates at a time, supervised by two correction officers. Id. ¶¶ 15-17.

These religious accommodations were made in accordance with the Religious Services Handbook (the "Handbook"), a document created by the DOC with the help of chaplains and prison administrators to align the goal of accommodating inmates' faith with the health, safety, security, and fiscal constraints faced

[3]

by the prison system.  <u>Id.</u> ¶¶ 6-7.  If an inmate wants a religious accommodation that does not appear explicitly in the Handbook, he may file a formal request and supporting documentation to the superintendent of his prison, who will then forward the information to a designated committee of prison officials.  <u>Id.</u> ¶ 10.  After reviewing the request, the committee makes a recommendation to the commissioner of the DOC, who then makes a final decision on the accommodation.  <u>Id.</u> ¶ 11. Before filing this action, LaPlante attempted to obtain his requested accommodations through this procedure, but his request was denied.  Compl. ¶¶ 5-6.

## II.  ANALYSIS

### A.  Legal Standard

#### 1.  Standard of Review

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is considered material if it "might affect the outcome of the suit under the governing law," and a dispute over these facts is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The burden of proving the lack of genuine dispute over a material fact rests with the moving party.  <u>Finn</u>

[4]

v. <u>Consol. Rail Corp.</u>, 782 F.2d 13, 15 (1st Cir. 1986). A court ought grant a motion for summary judgment when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 323 (1986). In evaluating the factual record, however, a court must "disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151 (2000). Where, as here, a court is dealing with cross-motions for summary judgment, it must "consider each motion separately, drawing inferences against each movant in turn." <u>Blackie</u> v. <u>State of Maine</u>, 75 F.3d 716, 721 (1st Cir. 1996) (quoting <u>EEOC</u> v. <u>Steamship Clerks Union, Local 1066</u>, 48 F.3d 594, 603 n.8 (1st Cir. 1995)) (internal quotation marks omitted).

### 2. RLUIPA

LaPlante brings this case under RLUIPA, 42 U.S.C. §§ 2000cc et seq., a statute passed in the wake of <u>Employment Division, Department of Human Resources of Oregon</u> v. <u>Smith</u>, 494 U.S. 872 (1990), and <u>City of Boerne</u> v. <u>Flores</u>, 521 U.S. 507 (1997), to ensure that certain groups receive religious protection beyond that granted by the First Amendment. <u>See</u> <u>Holt</u> v. <u>Hobbs</u>, 135 S. Ct. 853, 859-60 (2015). Section 3 of the statute prevents state governments from interfering with the religious exercise of

prison inmates.  Id. at 860; 42 U.S.C. § 2000cc-1.

Specifically, Section 3 states that "[n]o government shall

impose a substantial burden on the religious exercise of a

person residing in or confined to an institution . . . unless

the government demonstrates that the imposition of the burden on

that person is in furtherance of a compelling government

interest, and is the least restrictive means of furthering that

compelling government interest."  42 U.S.C. § 2000cc-1(a).  Each

of these prongs – the substantial burden and the compelling

interest – shall be discussed further below.

### a.    Substantial Burden

As a threshold matter, an inmate filing a suit against his

prison under RLUIPA bears the burden of proving (1) that the

prison's actions implicate his religious exercise, and (2) that

the prison's actions substantially burden that exercise.  Holt,

135 S. Ct. at 862.  Religious exercise is defined capaciously as

"any exercise of religion, whether or not compelled by, or

central to, a system of religious belief."  Id. at 860 (quoting

42 U.S.C. § 2000cc-5(7)(A)) (internal quotation marks omitted).

While a prisoner need not prove that the contested practice is

compelled by or central to his religion – or even that the

practice is subscribed to by other adherents of that religion,

id. at 862-63 (citing Thomas v. Review Bd. of Indiana Emp't Sec.

Div., 450 U.S. 707, 715-16 (1981)) – he must show that his

belief giving rise to that practice is sincere, id. at 862
(citing Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751,
2774 n.28 (2014)).  As the Defendants do not contest the
sincerity of LaPlante's beliefs, there is no need to expound
further on this issue.

What is disputed here, however, is whether the DOC has
substantially burdened LaPlante's Wicca faith - indeed,
LaPlante's first motion for summary judgment was denied on the
ground that he had not adequately demonstrated a substantial
burden.  Elec. Order, ECF No. 26.  RLUIPA itself does not define
the term "substantial burden," but the Supreme Court has
suggested in dicta that the term covers situations in which a
prisoner is required to "engage in conduct that seriously
violates [his] religious beliefs."  Holt, 135 S. Ct. at 862
(alteration in original) (quoting Hobby Lobby, 134 S. Ct. at
2775 (discussing this standard under RFRA, which applies to the
federal rather than state governments)) (internal quotation
marks omitted) (observing that a policy that forces a prisoner
to choose between violating his beliefs and facing discipline is
a substantial burden, but noting that the defendant did not
contest that its policy was a substantial burden).  Similarly,
the First Circuit has not directly defined the term as it
applies in the prison context, but it has accepted without
formally deciding that the term encompasses policies that put

"substantial pressure on an adherent to modify his behavior and to violate his beliefs." LeBaron v. Spencer, 527 F. App'x 25, 29 (1st Cir. 2013). In the land use context under RLUIPA, on the other hand, the First Circuit has adopted an approach that eschews an abstract test in favor of a functional analysis of the facts of a particular case. Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 95 (1st Cir. 2013).

Overall, while the existence of a substantial burden may often be context-specific, "[c]ourts have little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden." LeBaron, 527 F. App'x at 29 (quoting Cryer v. Mass. Dep't of Corr., 763 F. Supp. 2d 237, 247 (D. Mass. 2011) (Saris, J.)). On the other hand, "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs," do not constitute substantial burdens. Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 450-51 (1988) (describing First Amendment standard that RLUIPA was intended to emulate).

### b. Compelling Interest

Once an inmate has demonstrated that a prison policy substantially burdens his religious exercise, the burden shifts

to the defendant to show that its policy is the least restrictive means of serving a compelling government interest. E.g., Holt, 135 S. Ct. at 863 (citing 42 U.S.C. § 2000cc-1(a)). Given RLUIPA's emphasis on protecting religious liberty, this burden requires a "more focused inquiry" into a policy's impact on a particular person rather than looking at more "broadly formulated interes[ts]." Id. (quoting Hobby Lobby, 134 S. Ct. at 2779) (internal quotation marks omitted). Thus, "RLUIPA requires [courts] to 'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants' and 'to look to the marginal interest in enforcing' the challenged government action in that particular context." Id. (quoting Hobby Lobby, 134 S. Ct. at 2779) (internal quotation marks omitted).

Courts have recognized a variety of compelling interests as contemplated by RLUIPA. These interests include (but are not limited to) stanching the flow of contraband, id.; maintaining prison security, Spratt v. Rhode Island Dep't of Corr., 482 F.3d 33, 39 (1st Cir. 2007); and maintaining order, discipline, and safety, see Cutter v. Wilkinson, 544 U.S. 709, 721-24 (2005). Controlling costs may also be a compelling interest, id. at 723 (discussing "consideration of costs and limited resources"); Holt, 135 S. Ct. at 866 (discussing a hypothetical compelling interest in "cost control or program administration"), but

RLUIPA explicitly states that a prison may be required "to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." 42 U.S.C. § 2000cc-3(c).

Regardless of the compelling interest a prison identifies, defendants in these types of cases are given some degree of deference when articulating that interest; after all, "[p]rison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise." Holt, 135 S. Ct. at 864. This respect ought not be unquestioning, however, as such deference "does not justify the abdication of the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard." Id.

## B.   LaPlante's Claims

LaPlante asks the Court for declaratory and injunctive relief regarding what he considers to be twelve different burdens on his religious exercise. Each of these alleged burdens and the Defendants' response will be discussed below, in the order in which they appear in the complaint.

### 1.   Corporate Worship

The first section of LaPlante's complaint alleges that his religious exercise is burdened by the DOC's rules regarding when he can engage in corporate worship (that is to say, worship with other Wiccans at MCI-Norfolk). Compl. ¶¶ 11, 13. Wiccans structure their worship around the phases of the moon –

specifically, the New, Waxing, Full, and Waning Moons.  Id. ¶
14.  The Waxing and Full Moons are seen as times to do rituals
and spells that bring positive things into the world, while the
Waning and New Moons are considered to be times to perform
rituals and spells that rid the world of negativity.  Id.  Some
spells must be "planted" at one phase of the moon before they
can be "harvested" at the next phase; if this planting is not
permitted, a spell cannot be completed.  Id.  The phases of the
moon are approximately seven to eight days apart.  Id. ¶ 17.

At the time he filed his complaint, LaPlante alleged that
he was only permitted to engage in corporate worship during the
eight seasonal festivals (Sabbats) and the twelve Full Moons
(Esbats), meaning that corporate worship was forbidden on the
New, Waxing, and Waning Moons.  Id. ¶¶ 11, 13.  Beginning in May
2014, more than a year after the complaint was filed, the
Defendants began allowing the Wiccans of MCI-Norfolk to meet
every Sunday from 6 to 8:15 p.m. in the CSD building.  Defs.'
Mem. 15; Sumner Aff. ¶ 16.  The DOC contends that this scheduled
weekly worship obviates LaPlante's request for worship on the
Waxing, Waning, and New Moons.  See Defs.' Mem. 15.  LaPlante
disagrees, stating that "[w]hile these phases come every 7 to 8
day[s], weekly worship on a set day, on Sunday, is not the
equivalent, because the worship is not being done o[n] the days
mandated by the Wicca faith."  Pl.'s Mem. 14.  Accordingly,

because he "is not allowed to worship on the days mandated by his faith," LaPlante contends that the DOC's worship schedule constitutes a substantial burden on his religious exercise.  Id.

The Court agrees with LaPlante that the undisputed facts of the current schedule for Wiccan worship demonstrate a substantial burden under RLUIPA.  Forcing a religious ceremony to take place at a time different than the one mandated by the faith strips the ceremony of its meaning and functionally amounts to a bar on the proper practice of that religion.  See, e.g., Couch v. Jabe, 479 F. Supp. 2d 569, 597-98 (W.D. Va. 2006) (holding that it constituted a substantial burden to hold a service three days after the end of Ramadan when Islam requires that the service take place the first morning after Ramadan). Because LaPlante has adequately proven a substantial burden, the burden now shifts to the Defendants to demonstrate a compelling government interest in scheduling Wiccan prayer during a particular two-hour block on Sundays rather than on the actual days of the New, Waxing, and Waning Moons.  The Defendants offer no such argument in their memorandum seeking summary judgment in their favor.  Defs.' Mem. 15.  Accordingly, because the Defendants have failed to proffer any argument or evidence on a dispositive issue on which they bear the burden of proof, Celotex Corp., 477 U.S. at 323, this Court GRANTS LaPlante's

motion for summary judgment and DENIES the Defendants' motion for summary judgment as they pertain to this particular issue.

### 2. Ritual Oils

LaPlante also asks the Court to order the DOC to provide him with thirty-six different kinds of ritual oils. Compl. ¶¶ 18-20. At present, MCI-Norfolk inmates are allowed to purchase four different kinds of oils designed to meet the needs of Muslim prisoners. Id. ¶ 21. LaPlante contends that each Wiccan oil has a different "energy," and each scent fulfills a different requirement of Wiccan worship. Pl.'s Mem. 11-12. If a Wiccan does not have a particular scent of oil, LaPlante implies, he cannot properly perform the spell that uses that kind of oil to achieve a particular result. See id. at 12. He claims that the Wiccans at MCI-Norfolk have attempted to "work around the lack of Ritual Oils" but have failed; accordingly, they have not attempted to cast a Circle (essentially, to engage in Wiccan worship) in more than a year. Id. Thus, he states that although the communal meetings can be used for discussion, he is unable to use these meetings to "worship in the manner that is required by the tenets of his faith." Id.

The Defendants offer several reasons why LaPlante should not be given the oils he requests. Because prayer oil has a scent, it can be used either as cologne or to mask the smell of contraband, such as cigarettes or drugs. Defs.' Mem. 11. On

top of the fact that the prison has an interest in stopping the spread of contraband, the Defendants contend that prayer oil has also developed secondarily harmful effects, as it has become a "commodity valued by inmates resulting in illegal trading among inmates, strong-arming, and theft." Id. at 11-12. The Defendants also note that inmates can use oil (prayer or otherwise) to slip out of handcuffs, make the floor slippery to thwart officers who enter their cells, or lubricate their body cavities to hide forbidden objects. Id. at 12. To avoid these security concerns, inmates are limited to having a total of one ounce of prayer oil. Id. In addition to security, the Defendants also note that allowing Wiccans at MCI-Norfolk access to more scents of oil would create logistical problems: it would be hard for the prison's vendors to obtain the wide variety of oils, the CSD building purportedly lacks sufficient storage room, and using oils on the floor of the CSD building to cast a circle would create housekeeping issues. Id. at 12-13. They also cite potential disparity concerns, suggesting that other inmates who would not have access to as wide a variety of oils would be jealous and could create problems for prison staff. Id. at 13. Accordingly, the Defendants say, limiting Wiccan inmates to the four kinds of prayer oil presently sold is the

least restrictive means of fulfilling a compelling government
interest in security.  <u>Id.</u> (citing Sumner Aff. ¶¶ 22-23).[2]

LaPlante offers several arguments against the Defendants'
position.  First, he notes that all thirty-six of the requested
oils are available from one of the prison's approved vendors for
a total cost of $166.50, suggesting that the burden of obtaining
these oils is far from prohibitive.  Pl.'s Mem. 3 (citing Aff.
Daniel LaPlante ("LaPlante Aff.") ¶ 4, ECF No. 32).  Second, he
argues that there is ample space in the CSD building to store
the oils, as the two lockers allotted to the Wiccan group are
nearly empty.  <u>Id.</u> at 4 (citing Aff. Francis Sepulveda

---

[2] The Defendants cite two cases in support of this
proposition, but both are distinguishable.  They cite <u>Rasheed</u> v.
<u>Comm'r of Correction</u>, 446 Mass. 463, 470, 473 (2006), for the
proposition that restrictions on the quantity or varieties of
prayer oils had an incidental effect on religious exercise and
were supported by compelling state interests, <u>see</u> Defs.' Mem.
13, but the court in that case highlighted the fact that (1) the
varieties of oil already provided were consistent with the
plaintiff's Muslim faith and (2) that compelling the plaintiff
to make prudent use of his oil would not "prevent[] any
religious practice."  <u>Rasheed</u>, 446 Mass. at 474.  That is not
the case here, as the failure of the DOC to provide LaPlante
with the requested kinds of oils does prevent him from
performing what he considers to be essential spells.
    Second, the Defendants cite <u>Hammons</u> v. <u>Saffle</u>, 348 F.3d
1250, 1255 (10th Cir. 2003), for the proposition that "prison
limits on possession of prayer oil [are] based on legitimate
penological concerns."  Defs.' Mem. 13.  The analysis they cite,
however, arises in the context of a First Amendment claim, <u>see</u>
<u>Hammons</u>, 348 F.3d at 1255, and the First Amendment offers less
religious protection to inmates than does RLUIPA, <u>Holt</u>, 135 S.
Ct. at 859-60.  The Tenth Circuit did not analyze that
plaintiff's claims under the stricter standards of RLUIPA for
procedural reasons, <u>see</u> <u>Hammons</u>, 348 F.3d at 1258, and thus its
analysis is of little use to the case now before the Court.

("Sepulveda Aff.") ¶ 4, ECF No. 30). Third, he claims that any instance of violating prison rules by misusing prayer oil would need to be reported by prison staff, and a review of the prison's disciplinary record archives shows no such reports - suggesting that, contrary to the Defendants' assertions, there is no illegal trade, strong-arming, or theft arising from the use of prayer oils. Id. at 4-5 (citing Aff. Douglas Weed ("Weed Aff.") ¶ 6, ECF No. 29).

The Court rules that LaPlante adequately has demonstrated that the limits on the kinds of oils available are a substantial burden on his religious exercise. By barring his access to the required scents, the Defendants prevent LaPlante from engaging in an essential part of Wiccan practice. At least one other district court confronting this precise issue has so held. See Levie v. Ward, No. CIV-05-1419-HE, 2007 WL 2840388, at *16 (W.D. Okla. Sept. 27, 2007) (holding that a prison policy limiting a Wiccan to five kinds of oil was a substantial burden under RLUIPA).

The question of the compelling government interest at stake is closer. Assuming that the one-ounce limit on the amount of oil permitted remains intact, some of the Defendants' proffered arguments have little to no bearing on the question at hand: allowing additional scents of oil does not make any difference in an inmate's ability to use the oil to slip out of handcuffs

or lubricate the floor or his body cavities, and it is difficult
to conceive how additional scents would give inmates a greater
ability to mask the scent of contraband than they have with the
scented oils they are currently allowed to possess. <u>Cf.</u> <u>Holt</u>,
135 S. Ct. at 863 (emphasizing that courts must evaluate the
marginal interest in enforcing challenged policies). The Court
gives greater weight to the Defendants' assertions that allowing
a wider variety of scented oils would facilitate strong-arming
and theft and would create logistical problems. While prison
administrators are given deference in RLUIPA cases, that
deference cannot be unquestioning, <u>id.</u> at 864 - and here,
LaPlante has offered specific evidence to counter each of the
Defendants' broad justifications for their existing policy
limiting inmates to four scents, <u>see</u> Pl.'s Mem. 3-5. Drawing
inferences against the movant, as is proper at the summary
judgment stage, the Court rules that the Defendants have not
adequately carried their burden of proving that their policy is
the least restrictive means of serving a compelling government
interest. <u>Cf.</u> <u>Levie</u>, 2007 WL 2840388 at *18 (noting that a
prison could conceivably sell a wide variety of Wiccan oils in
pre-approved blends to minimize administrative burdens). Nor
can summary judgment be granted to LaPlante - though he has
adequately proved a substantial burden on his religious
exercise, there remain sufficient material disputed facts (i.e.,

[17]

whether additional scents of prayer oil would lead to conflict among inmates) that the factfinder could reasonably find in favor of the Defendants.  Accordingly, both LaPlante's and the Defendants' motions for summary judgment are DENIED on this point.

### 3.    Ritual Herbs

Third, LaPlante requests that the Defendants allow him access to twenty-three different ritual herbs.  Compl. ¶ 26.  He claims that the herbs are an essential part of the practice of Wicca, as each different herb communicates a different message when offered to the Gods.  Pl.'s Mem. 17.  According to LaPlante, the Defendants' refusal to give him access to the requested herbs has forced him and the other Wiccans at MCI-Norfolk to "modify, and even violate [their] religious beliefs, by not allowing [them] the ability to communicate with the Wicca God and Goddess, in a manner that is required by [their] Wicca faith."  Id.  As with the ritual oils, LaPlante has shown a substantial burden, as the lack of ritual herbs prevents him from carrying out an important part of his religion.

The Defendants identify four reasons why their denial of access to the requested herbs passes RLUIPA's compelling interest prong: (1) the lack of storage space for herbs in the CSD building; (2) the administrative and financial burdens finding and purchasing the herbs would place on MCI-Norfolk and

its vendors; (3) the possible toxicity of some of the requested herbs; and (4) the burden on MCI-Norfolk staff of searching incoming property items. Defs.' Mem. 18-19 (citing Sumner Aff. ¶ 30). LaPlante seeks to rebut these claims with evidence of his own. He argues that the requested herbs can be purchased from an approved vendor for a total of $69 and that they could easily fit in the Wicca group's assigned lockers. Pl.'s Mem. 3-4 (citing LaPlante Aff. 4; Sepulveda Aff. ¶ 4). He adds that MCI-Norfolk's Native American religious group is allowed to use several of the requested herbs, and some of the herbs are also grown in the gardens of each of MCI-Norfolk's housing units and in the prison yard. Id. at 8 (citing Weed Aff. ¶ 9; Sepulveda Aff. ¶ 9). Lastly, he contends that the requested herbs are nontoxic. Compl. ¶ 28.

Summary judgment cannot enter for the Defendants on this point. All of their proffered justifications for the denial of any herbs to the Wiccans of MCI-Norfolk are exceptionally broad, and in one case slightly hypothetical. See Defs.' Mem. 19 (noting that some of the herbs "appear to be toxic"). Following the Supreme Court's admonition in Holt that prison administrators should not be given unquestioning deference, the Court is unwilling to find that the Defendants have carried their burden on this matter (particularly when faced with the specific facts offered by the plaintiff). The Court cannot rule

that LaPlante is entitled to summary judgment either.  There
appears to be a dispute over several material facts, including
storage space and the cost and toxicity of the herbs in
question.  Given that a factfinder is entitled to disbelieve
LaPlante's rebuttal of the Defendants' argument that their
existing policy is the least restrictive means of serving a
compelling government interest, see Reeves, 530 U.S. at 151, the
Court cannot rule that the Defendants have failed to meet their
burden as a matter of law.  Thus, both LaPlante's and the
Defendants' motions for summary judgment are DENIED as to the
request for ritual herbs.

### 4.   Ritual Teas

Fourth, LaPlante asks that the Court order the Defendants
to provide him with sixteen different ritual teas.  Compl. ¶ 31.
At present, inmates at MCI-Norfolk are given access to black and
green teas, but not to any of the Wiccan ritual teas requested
by LaPlante.  See Defs.' Mem. 13.  As with the ritual oils and
herbs, LaPlante contends that the requested teas each have a
different energy that is a critical component of different kinds
of spells and rituals and that different teas are required for
each Full Moon ceremony; because of the lack of the proper teas,
LaPlante states that the Wiccans of MCI-Norfolk have not been
able to attempt to cast a circle in over a year.  Pl.'s Mem. 13.
By refusing him access to the proper teas, LaPlante says, the

Defendants prevent him from worshipping in the manner required by the tenets of his faith. Id. The Court rules that - as with the ritual oils and herbs - the denial of teas necessary to cast certain spells constitutes a substantial burden on LaPlante's religion.

Turning to the second prong of RLUIPA, the Defendants advance arguments that are substantially identical to the ones they offered regarding the requested ritual herbs. Specifically, they cite (1) the cost and burden of obtaining the teas; (2) the storage capacity of the CSD building; (3) the toxicity of some of the teas when consumed in excessive amounts; (4) the potential jealousy that may arise among other inmates if Wiccans are given access to a wider variety of teas; and (5) the burden on MCI-Norfolk staff of searching incoming property items. Defs.' Mem. 13-14 (citing Sumner Aff. ¶ 24). LaPlante offers several rebuttals. He notes that the requested teas are available from an approved vendor for a total of $31.20; that there is ample space in the Wiccan lockers in the CSD building; and that the teas are non-toxic and would not be consumed in excessive amounts. Pls.' Mem. 3-5 (citing LaPlante Aff ¶¶ 4, 9; Sepulveda Aff. ¶ 4; Compl. ¶ 32).

As with the ritual herbs, the Court cannot grant summary judgment to the Defendants here. When faced with the specific facts offered by LaPlante and drawing inferences in his favor,

it would require more deference to the Defendants than is due to rule that their broad assertions carry the burden of proving that their flat denial of the requested teas is the least restrictive means of serving a compelling government interest. Similarly, the Court cannot grant summary judgment to LaPlante either, as there are sufficient disputes over material facts (such as storage space, the burden of procuring and searching the teas, and the teas' toxicity). Accordingly, both LaPlante's and the Defendants' motions for summary judgment are DENIED on this ground.

### 5. Ceremonial Robes

Fifth, LaPlante asks that he and other Wiccans at MCI-Norfolk be allowed to wear ceremonial robes during their corporate worship. Compl. ¶ 33-34. He offers no argument, however, as to how the Defendants' refusal to provide him with these robes forces him to violate his religious beliefs. See Pl.'s Mem. Indeed, the Court views the lack of robes as, at most, an incidental burden on LaPlante's Wicca faith. See Lyng, 485 U.S. at 450-51. Without any additional argument on this point, the Court sees no reason to revisit its earlier ruling denying LaPlante's motion for summary judgment on the ground that he had not proven a substantial burden. Elec. Order, ECF No. 26. Accordingly, LaPlante's motion for summary judgment is

DENIED and the Defendants' motion for summary judgment is GRANTED as to the provision of ceremonial robes.

### 6. Ceremonial Medallions

Sixth, LaPlante requests that the Defendants provide nine different ceremonial medallions, each of which is used to "identify those serving a specific function (or role) within a ritual." Compl. ¶¶ 35-36. At present, MCI-Norfolk inmates are allowed to buy five different medallions from the prison's approved vendor, but none of those medallions are the same as those requested by LaPlante. See Defs.' Mem. 6. LaPlante takes care to note that the medallions he asks for comply with the prison's size restrictions and that the "role" medallions are different than the "individual" medallions currently provided. Pl.'s Mem. 8. What he does not do, however, is state how the Defendants' refusal to provide him with role-identifying medallions causes him to violate his beliefs. See id. Viewing the record before it, the Court does not see how the lack of a role-identifying medallion actually prevents an inmate from carrying out that role. Thus, the burden placed on LaPlante and the other Wiccans of MCI-Norfolk by the Defendants' refusal to give him the requested medallions is incidental at best. See Lyng, 485 U.S. at 450-51. Thus, LaPlante's motion for summary judgment is DENIED and the Defendants' motion for summary judgment is GRANTED on this ground.

### 7.  Nuts and Fruits

Seventh, LaPlante demands that the Defendants provide him with a variety of fruits and nuts, including hazelnuts, Brazil nuts, lemons, blueberries, black olives, raisins, blackberries, green apples, dates, and raspberries.  Compl. ¶ 40.  He contends that each of these items is required at a particular time as an offering for the Wiccan God and Goddess; "[i]f a Gift/Offering is not provided, the God and Goddess does [sic] not come." Pl.'s Mem. 14.  Put succinctly, he states that the rule is "no offering, no worship."  Id.  The Court concludes that this adequately demonstrates a substantial burden for the purposes of RLUIPA.  If the Defendants' denial of fruit and nuts prevents LaPlante from properly summoning the Wiccan God and Goddess to his worship, this denial functionally strips the worship of its religious significance and constitutes a constructive bar to proper practice of the faith.

Turning to RLUIPA's second prong, the Defendants offer two reasons why their denial of the requested fruits and nuts for corporate worship is the least restrictive means of serving a compelling government interest.  First, they note that many of the requested items can be ingredients for "homebrew," an illicit alcoholic beverage that inmates previously made when fresh fruit was available from the prison canteen.  Defs.' Mem. 14 (citing Sumner Aff. ¶ 25).  Second, they note several issues

with storage, citing the lack of space in the CSD building for both refrigerated and dry items and the possibility that stored fruits and nuts could attract insects and rodents. Id. (citing Sumner Aff. ¶ 25). In response, LaPlante points out that fresh fruit is sent over to the CSD building from the prison kitchen once or twice a month for weekend retreats held by the "Alternative to Violence" program. Pl.'s Mem. 5 (citing Aff. John Stote ("Stote Aff.") ¶ 6, ECF No. 31).

LaPlante has the better of the argument. If preventing the creation of homebrew is the compelling government interest at stake, then denial of any access to the requested fruits whatsoever cannot be the least restrictive means of achieving that goal, as Wiccan prisoners – like the participants in the Alternative to Violence program – could be given access to the fruit only in the CSD building rather than in their cells (where they could conceivably make the beverage). Similarly, denial of any fruit cannot be the least restrictive means of serving the interest of optimizing storage space, as LaPlante's evidence shows that fresh fruit used by other groups in the CSD building is sent over from the kitchen rather than stored in the CSD building itself. The Court rules that the Defendants have failed to carry their burden on this part of the test, and accordingly, it GRANTS LaPlante's motion for summary judgment

and DENIES the Defendants' motion for summary judgment on this point.[3]

### 8. Outdoor Worship

Eighth, LaPlante requests that the Wiccans at MCI-Norfolk be allowed to worship outside. Compl. ¶¶ 41-44. At present, all corporate worship for Wiccans takes place in the basement of the CSD building. Id. ¶ 41. Because it is a nature-oriented religion, however, Wicca requires that its adherents perform an "Earth Offering" involving placing an offering on the ground. Id. ¶ 42; Pl.'s Mem. 14. Because the Defendants have failed to allow the Wiccans to worship outside, they are unable to perform this ceremony. Compl. ¶ 44; Pl.'s Mem. 15. This is a textbook substantial burden under RLUIPA, as the Defendants are directly barring LaPlante and his fellow Wiccans from performing what they see as a necessary ritual.

---

[3] The Court wishes to clarify the scope of its grant of summary judgment on this point. The complaint requests an injunction "requir[ing] the defendants to provide Mr. LaPlante with each of the items . . . set out in this Complaint, or a means of obtaining such items." Compl. 17. While the Court has held that it is unlawful for the Defendants to deny LaPlante any access to the requested nuts and fruits whatsoever, it does not go so far as to order them to provide these items at their own cost. Rather, the Defendants may comply with this Court's order by providing LaPlante and his fellow Wiccans with some way of purchasing the requested items for themselves. Cf. Abdulhaseeb v. Calbone, 600 F.3d 1301, 1320 (10th Cir. 2010) (noting that RLUIPA "requires governments to refrain from substantially burdening religion, not to affirmatively subsidize religion"); 42 U.S.C. 2000-cc-3(c).

Turning to the second prong of RLUIPA, the Defendants argue that allowing the Wiccans to worship outside presents security issues. At present, the only religious group afforded outdoor worship is the Native American group, who are only allowed outside because their ceremony requires the use of tobacco and the Defendants do not allow tobacco to be smoked inside the CSD building. Defs.' Mem. 15 (citing Sumner Aff. ¶ 31). They further state that "MCI-Norfolk does not have sufficient staffing or a separate outdoor space in which to provide plaintiff with outdoor meetings." Id. Additionally, they argue that the Wiccans cannot be outside at the same time as the Native American group because the prison's limited staffing and outdoor space means the groups would be in close enough proximity to interfere with one another's ceremonies. Id.

In response, LaPlante notes that when they are outdoors twice a week, the Native American group is supervised by a recreation officer who oversees the outdoor gym at the same time; he further notes that an officer supervises the outdoor gym every morning. Pl.'s Mem. 5-6. He adds that the outdoor religious area goes unused several mornings each week, implying that there would be virtually no additional burden or staffing requirements inherent in letting the Wiccans worship outside. See id. at 6.

There are critical material facts here that remain in dispute – namely, whether MCI-Norfolk has sufficient staffing to oversee outdoor worship for the Wiccan group. Accordingly, both LaPlante's and the Defendants' motions for summary judgment must be DENIED on this point, as the outcome of this factual dispute would be critical for finding in favor of either party. The Court makes clear, however, that it does not look kindly on situations where the government grants privileges to one religious group and not another.

### 9. Communal Meals

Ninth, LaPlante requests that the Defendants allow the Wiccan group to have a communal meal on each of the eight seasonal festivals celebrated by members of the religion. Compl. ¶¶ 45-47. He claims that sharing a feast with other Wiccans is a key component of celebrating the seasonal festivals, and the Defendants' policy denying the group communal meals "force[s him] to violate his religious beliefs, by not allowing [him] to fulfill a mandate of his Wicca faith." Pl.'s Mem. 15. For the purposes of summary judgment, the Court rules this statement sufficient to demonstrate a substantial burden under RLUIPA.

The Defendants note that the MCI-Norfolk kitchen provides between two and four communal meals annually for Muslims, Jews, and Native Americans, but they contend that providing eight

meals annually for the Wiccans would lead to two problems:
first, they note that providing eight meals would be costly and
place burdens on the kitchen staff, and second, they argue that
giving the Wiccans eight communal meals each year when other
groups get half that number at most would foster jealousy and
conflict between inmate groups.  Defs.' Mem. 16 (citing Defs.'
Mem., Ex. 3, Aff. Christopher Gendreau ("Gendreau Aff.") ¶ 7,
ECF No. 25-3).  In response, LaPlante notes that Wiccan inmates
at another DOC facility get eight communal meals each year,
Pl.'s Mem. 6 (citing Sepulveda Aff. ¶ 6), and further observes
that when he initially applied for religious accommodations
through the prison's internal system, he stated that he would be
willing to have the same feast as the Native American group
(currently given four feasts each year) due to the similar
nature of the two faiths, id. (citing Sepulveda Aff. ¶ 7).

The Defendants cannot obtain summary judgment on this
point.  Though the Court acknowledges that avoiding conflict
between inmates is a compelling government interest, it strikes
the Court as specious to suggest that the least restrictive
means of achieving this interest is to deny the Wiccans any
communal meals whatsoever: rather, the least restrictive
alternative would be to grant them the same number of communal
meals as are granted to other religious groups.  Moreover, the
Defendants offer no evidence of any specific burden of providing

these meals, simply providing an affidavit expressing "concern" in a generic sense. Gendreau Aff. ¶ 7. The Court cannot accept this generalized statement as sufficient to carry the Defendants' burden. Nor can the Court grant summary judgment to LaPlante: while it does not think the Defendants have adequately justified providing zero communal meals to the Wiccans, it also respects the Defendants' concern about the consequences of providing eight meals. Given the posture of the case, the Court does not think it appropriate to order that some intermediate number of meals be given, and accordingly, the Court DENIES both LaPlante's and the Defendants' motions for summary judgment on this point. The Court reiterates, however, its earlier statement that disparate treatment of religious groups ought be frowned upon.

### 10. Varieties of Cake

Tenth, LaPlante requests different varieties of cake for each of the monthly Full Moon celebrations. Compl. ¶¶ 48-52. He claims that "[i]t is a practice of the Wicca faith to have juice and 'cake' at Wicca celebrations, and the cake should 'excite the senses.'" Id. ¶ 48. For each Full Moon celebration, the Defendants currently provide the Wiccans of MCI-Norfolk with a yellow sheet cake with icing, Defs.' Mem. 17, but LaPlante contends that the yellow cake is "ordinary" and "creates a somber energy." Compl. ¶ 49. He argues that the

Wiccans at MCI-Norfolk rely on cake that "excites the senses" in order to create a sacred space for their ritual.  Id. ¶ 50.  In the event the Court does not grant him this requested relief, he also notes in his memorandum in support of summary judgment that he would also be willing to bake his own cakes in his housing unit's kitchen to bring to worship at the CSD building.  Pl.'s Mem. 16.

This Court rules that LaPlante has not adequately proven a substantial burden on this point.  While it cannot be disputed that it would be more exciting to get a different kind of cake every month, LaPlante has not offered enough evidence to show that the uniformity of the cake provided by the Defendants has forced him to alter or abandon his religious practice in some material way.  Rather, the Defendants' cake policy strikes the Court as one that "may make it more difficult to practice certain religions but which ha[s] no tendency to coerce individuals into acting contrary to their religious beliefs," Lyng, 485 U.S. at 450-51, and accordingly, the Court need not analyze the parties' arguments regarding RLUIPA's second prong.  On this point, then, the Court DENIES LaPlante's motion for summary judgment and GRANTS the Defendants' motion for summary judgment.

### 11.  Everyday Items

Eleventh, LaPlante requests an array of "everyday items" - specifically baking soda, black salt, flour, honey, molasses, oatmeal, sea salt, and sugar - that he claims are necessary for the performance of Wiccan rituals and ceremonies. Compl. ¶¶ 53-55. Seeking to carry his burden on the first prong of RLUIPA, LaPlante argues that both black salt and sea salt are necessary to the casting of a circle, which is essential to Wiccan worship. Pl.'s Mem. 15-16. This is sufficient to prove a substantial burden. Regarding the other items requested, however, LaPlante offers no argument as to how the Defendants' refusal to grant him access to these items substantially burdens his religious exercise. See id. Accordingly, as to the baking soda, flour, honey, molasses, oatmeal, and sugar, the Court rules that LaPlante has not carried his burden and that the Defendants are entitled to summary judgment.

Turning to the second prong of RLUIPA, the Defendants offer four justifications for their denial of the items requested by LaPlante: (1) that molasses, honey, sugar, oatmeal, flour, and baking soda can be used to make homebrew; (2) that using these items to cast a Circle on the floor of the CSD building could create sanitation issues and attract rodents and insects; (3) that there is not sufficient storage in the CSD building for the requested materials; and (4) that the Wiccans already have access to what the Defendants refer to as a "magic circle for

creating a circle." Defs.' Mem. 17 (citing Sumner Aff. ¶ 28).

Given that the only requested materials to pass the first prong

of RLUIPA were both merely salt, the Defendants' first

justification falls away; the Court is also skeptical that salt

on the floor could create the sanitation issues being discussed.

In the Court's view, there are two material disputes of fact.

First, the parties dispute whether there is sufficient storage

space for the requested items. Compare id., with Pl.'s Mem. 4

(citing Sepulveda Aff. ¶ 4) (stating that there is ample space

in the Wicca group's allotted lockers). Second, the parties

dispute whether the "magic circle" provided by the Defendants is

indeed sufficient for the Wiccans' religious purposes: the

Defendants claim that the magic circle for sale at the prison

canteen can be used to cast a circle, Defs.' Mem. 17, while

LaPlante says that, as contemplated by Wicca, a Circle is more

akin to a prayer and accordingly cannot be a physical object,

Pl.'s Mem. 3 (citing Sepulveda Aff. ¶ 3). If the Defendants are

correct that the "magic circle" provided in the canteen can be

used to cast a circle, then that could be considered the least

restrictive means of maintaining sanitation and storage needs

while accommodating the religious needs of the Wiccans; if,

however, LaPlante's view of a circle were to prevail, then the

item in the canteen is no accommodation at all. Accordingly,

LaPlante's motion for summary judgment on this point is DENIED,

and the Defendants' motion is GRANTED IN PART AND DENIED IN PART (specifically, denying the motion with respect to salt and granting it with respect to the other requested items).

### 12. Colored Pens

Last, LaPlante requests that he be given colored pens in order to write in his Book of Shadows, as is required by the Wicca faith. Compl. ¶¶ 56-59. Wiccans are required to record their religious practice in their Book of Shadows, and each invocation must be done in a different color; "when [a Wiccan] lacks a color, or an alternative substitute color, he is forced to modify, or even violate his faith, by not writing down what is actually planned or took place during a celebration, ritual, or invocation." Pl.'s Mem. 8. The Defendants point out that they already provide colored pencils for purchase at the prison canteen. Defs.' Mem. 20. LaPlante responds by arguing that records in the Book of Shadows must be permanent, and thus a permanent form of writing is required. See Pl.'s Mem. 8, 17 (citing LaPlante Aff. ¶ 12).

The Court rules that LaPlante has not adequately shown a substantial burden under RLUIPA. As a technical matter, the only time that LaPlante explicitly alleges he must modify his religious practice or violate his religious faith is if he does not have access to proper colors of writing implements; he does not allege specifically and directly that the lack of a

permanent writing implement forces him to violate his beliefs.

See id. More fundamentally, however, the Court views the

arguable difference in permanence between pens and pencils as an

"incidental effect[] of [a] government program[], which may make

it more difficult to practice certain religions but which ha[s]

no tendency to coerce individuals into acting contrary to their

religious beliefs." Lyng, 485 U.S. at 450-51. Accordingly,

LaPlante's motion for summary judgment is DENIED and the

Defendants' motion for summary judgment is GRANTED on this

point.

## III. CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART LaPlante's

motion for summary judgment, ECF No. 28, and GRANTS IN PART AND

DENIES IN PART the Defendants' motion for summary judgment, ECF

No. 24, as follows:

| RELIEF REQUESTED | LAPLANTE'S MOTION | DEFENDANTS' MOTION |
| --- | --- | --- |
| Corporate Worship | GRANT | DENY |
| Ritual Oils | DENY | DENY |
| Ritual Herbs | DENY | DENY |
| Ritual Teas | DENY | DENY |
| Ceremonial Robes | DENY | GRANT |
| Ceremonial Medallions | DENY | GRANT |
| Nuts and Fruits | GRANT | DENY |
| Outdoor Worship | DENY | DENY |
| Communal Meals | DENY | DENY |
| Varieties of Cake | DENY | GRANT |
| Everyday Items | DENY | GRANTED IN PART, DENIED IN PART |
| Colored Pens | DENY | GRANT |

The case shall stand for a jury-waived trial on the May 2015 running trial list to resolve the material factual disputes identified herein.

**SO ORDERED.**

_/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE